# Wood *versus* Appal.

1. A survey returned as bounded by a navigable river vests in the owner the right of soil to ordinary low-water mark of the stream, subject to the public right of passage, &c., between ordinary high and low water mark.

2. The language of the return matters little, if the intention to make the stream the boundary sufficiently appear; both the description and diagram are taken together in determining this.

3. Where a vendor conveys by established land-marks, the subject of the grant will neither overrun nor fall short of them.

4. The land-marks form the true boundary; the courses and distances serve merely to point to the place.

5. Kelly *v.* Graham, 9 Watts 116, Wharton *v.* Garvin, 10 Casey 340, distinguished.

6. Where the lines of adjacent surveys are both found run and actually marked on the ground, they overcome the calls for each other or even calls for a natural or other boundary.

7. When a return of survey calls for a stream as its boundary or to run by, along, up or down it, the title will run to the stream, and the marking of trees on the bank or margin of the stream, to identify the lines run to the river, as well as the return of courses and distances measured along the margin necessarily to ascertain the quantity of land in the survey, will not restrain the title to the bank or margin only.

8. Public surveys and private surveys and deeds are alike in this respect.

9. In navigable streams the title runs to the ordinary low-water line; in unnavigable, to the middle of the stream.

10. If the stream is not made the boundary, or if a line is actually run and marked for a survey apart from the stream, the rule changes to suit the facts of the case.

11. The line of a survey was by an oblique course "to a post on the bank of the Ohio river:" to ascertain the front of the riparian owner at the low-water line, the course from the post is to be run at right angles with that line, and not to. continue in the oblique direction by which it reached the post.

12. Starting from the bank, a direct course to the stream or at right angles to it, will always afford the shortest and most certain boundary of river frontage.

13. This rule applies only where no other intention is disclosed by the return of survey or the deed.

[Wood v. Appal.]

November 11th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the District Court of *Allegheny county :* No. 116, to October and November Term 1869.

This was an action of ejectment to July Term 1866, for one acre of ground in West Pittsburg, brought by Adam Appal, lessee of Elizabeth F. Denny, against James Wood. The defendant having died pending the suit, his widow and devisees were substituted as defendants.

The land in controversy was part of a tract of 640 acres on the south bank of the Ohio river, known as "Elliott's Delight," which had been patented to Daniel Elliott on the 27th of April 1785.

The plaintiff gave in evidence the patent on which the tract was described as beginning " at a corner hickory of Pittsburg Manor, standing on the bank of the Ohio river, thence by said Manor S. 14° W., &c. * * * N. 37° E., 60 perches, to a corner ironwood tree standing on the bank of said Ohio river, thence up the river 233 perches to the first-mentioned hickory, the place of beginning." Both parties claimed under West Elliott who had acquired Daniel Elliott's title. The plaintiff then gave in evidence, deed, West Elliott to William Price, dated September 12th 1804, for 15 acres, 157 perches, on the south side of the Ohio river, &c., part of the 640 acres, beginning at a stake on the bank of said river, and running by land of said West Elliott, S. 84° W. $3\frac{8}{16}$ perches, &c. * * * N. 75° E. 12 perches, to a thorn; N. $63\frac{1}{2}$° E., $7\frac{5}{10}$ perches, to a stake on the bank of the aforesaid river; and thence up the same, S. 62° E., 4 perches, to the place of beginning." Also deed for the last-mentioned tract from Price to James O'Hara, dated April 6th 1805. Also deed from West Elliott to James O'Hara, dated May 15th 1809, for 98 acres 100 perches, part of "Elliott's Delight," beginning at a post on the bank of the Ohio river, and running thence by the manor line, S. $11\frac{1}{2}$° W., 210 perches, to a white oak and post; thence, by lands of James O'Hara, &c. * * * N. 75° E., 12 perches, to a thorn tree; N. $63\frac{1}{2}$° E., $7\frac{5}{10}$ perches, to a post on the bank of the Ohio river, and thence up the river to the place of beginning.

" Provided always nevertheless, that if at any time hereafter, the said James O'Hara or his heirs or assigns, do or shall keep or use a ferry-house, tavern, store or public warehouse, for the storing of goods other than such as shall be raised or manufactured on the premises hereby granted, on that part of the above described and granted tract of land which is hereinafter described, to wit: 'Beginning at the post on the Ohio river just above mentioned, and running thence by the manor line' * * * ' to a thorn tree; thence N. $63\frac{1}{2}$° E., $7\frac{5}{10}$ perches, to a post on the bank of the river, and thence up the river to the place of beginning, and shall continue to keep or use such ferry house, tavern, store or

public warehouse, twenty-one days after notice in writing shall be given to him or them by the said Elliott or his heirs or assigns, to desist from keeping or using such ferry-house, tavern, store or public warehouse—then and in such case the last described and bounded part of the same tract of land shall revert to and become the estate in fee of the said West Elliott or his heirs or assigns." This conveyance included the tract of 15 acres and 157 perches granted to Price and by him to O'Hara.—The 98 acre tract became vested in Elizabeth F. Denny under the will of James O'Hara, dated September 1819, and deeds dated March 30th 1842, to bar an entail created by the will: Also lease, Elizabeth F. Denny to plaintiff, dated March 31st 1865, for " all that lot and premises situate in West Pittsburg, Allegheny county, Pennsylvania, bounded and described as follows, viz.: Beginning on the Washington Turnpike road, at its eastern intersection with the line of property belonging to Singer, Hartman & Co., thence along the said turnpike road westwardly seven hundred and sixteen feet and two and a half inches to line of Crawford's property; thence north 65° 10' E., about 335 ft. to low-water mark on the Ohio river; thence, along the low-water line, up the Ohio river, to the boundary line of Singer, Hartman & Co.; thence along said line south 36° 30' W., about 266 ft. to the Washington Turnpike road, at the place of beginning. Being all that piece of ground belonging to the party of the first part, lying between the Washington Turnpike road and the Ohio river, in the borough of West Pittsburg, subject to all leases now in force with other tenants, and the party of the first part, on the above-described premises." * * * "And it is furthermore understood between the parties to this agreement, that there shall be no deduction made from the aforementioned annual rent, on account of any pretended interference on the above-described premises, by parties now in possession of what was formerly Crawford's property, but that the party of the first part will use all reasonable diligence to settle any such interference, so as to put the party of the second part into peaceable and quiet possession of the same." * * *

The defendants gave evidence tracing the title of the remainder of "Elliott's Delight" to Robert Crawford by numerous conveyances, the last being dated June 11th 1841, and conveyance of the whole by Crawford to James Wood, January 1st 1864.

The plaintiff claimed that he was entitled to the land to the low-water line of the Ohio river, and that from the monuments on the bank as mentioned in the deed, his lines should be run perpendicularly or at right angles to the low-water line of the stream, so as to give him as much front at the low-water line as he had at the top of the bank. The defendants claimed that the plaintiff

[Wood v. Appal.]

had no title to any land between the exact spot of his monuments and the low-water line, that is that his south or lower line was a line between his east and west corners on the top of the river bank, or if plaintiff's line should go to the low-water line, it should be by extending his western line according to the oblique course by which it reached the monument or at the top of the banks, that is North 63½′ E. through "the post on the bank of the river." This, as was alleged by the plaintiff, and as appeared to be sustained by the evidence, would leave him little or no front at the low-water line.    The annexed diagram will explain the claim of each.    In the lease to the plaintiff from Mrs. Denny, the west line was stated to be from a point in the east line of " Crawford's property" (the west line of Mrs. Denny's) "N. 65° 10′ E., to low-water mark in the Ohio river.    The perpendicular line claimed by the plaintiff from " the post on the bank of the river," would be S. 28° W., and between that line and the line as stated in plaintiff's lease there would be a triangle whose apex would be " the post," &c. which would be east of what was claimed as Mrs. Denny's west line.    The plaintiff alleged that so stating the line was a mistake of description by the scrivener who drew the lease, and that it is controlled by the general description in the lease, demising " all that piece of ground belonging to the party of the second part lying between the Washington Turnpike road and the Ohio river in West Pittsburg."    (See accompanying diagram.)

The plaintiffs gave evidence by surveyors and others showing that the land in dispute was included within the lines of his deeds; also the exercise of acts of ownership over it by his predecessors.

The defendants gave evidence to prove surveys and the manner in which the land had been used for many years, as bearing both on the question of title and the Statute of Limitations.    They also gave evidence to show that if the theory of the plaintiff was correct, the shore below him was such that West Elliott could not have any landing at all.

The plaintiff's 1st and 2d points were :—

" 1.  The deed in evidence from West Elliott and wife to James O'Hara conveyed to the latter title down to the low-water mark of the Ohio river.

" 2.  In ascertaining the extent of the river front of the plaintiffs' lessor, Elizabeth F. Denny, at low-water mark, the line between her property and defendant's must be run perpendicular, or at right angles to the base line between her two corners called for in the deed of Elliott to O'Hara, and designated by monuments on the bank, and the plaintiff's lessor, Mrs. Denny, is entitled under her deed to all between said corners, said right angled line, low-water mark of the Ohio river and the manor line."

The court affirmed these points.

[Wood *v.* Appal.]

[Wood *v.* Appal.]

The defendants submitted these points:—

"7. If the land conveyed by West Elliott to Price and O'Hara was intended to be, and is bounded on the north side thereof by the Ohio river, then the lines on the east and west sides must extend and go to the said river by the course of the last lines next said river, and no new or additional lines, with different courses, can be introduced as boundaries on the east and west sides of said land.

"10. The true meaning of the deed of West Elliott to O'Hara as construed by the prohibitory clause and calls therein contained, is, that the river front or landing, now in dispute, was not intended to be conveyed by said deed, therefore, the prohibition of a ferry was not necessary, but a *ferry-house*, or *tavern*, was prohibited, as they could be erected outside of the land in dispute.

"11. The lease by Mrs. Denny to Adam Appal being bounded on the west side thereof by the dividing line between Mrs. Denny and defendants, viz.: The last line next the river extended north 65° 10' east, 335 feet to low-water mark. The ground west of said line is not leased to plaintiff, and the plaintiff cannot recover any ground west of said line."

The court answered all the defendants' points as follows:—

"The defendants' points, so far as they have any bearing on the case, are sufficiently answered in the general charge; and so far as they are not answered, they are declined."

The court (Hampton, P. J.), after stating the titles of the parties respectively, &c., charged :   *   *   *

"The plaintiffs' counsel contend that *the title given in evidence by them extends to low-water mark, and consequently covers the land in dispute.*

"The defendants deny the allegation and contend:—

"1st. That their title embraces the disputed ground.

"2d. That even if the lines of the plaintiffs' survey are to run to the river, they must be extended thereto by the same courses at which they stopped on the bank, which would leave out of the survey a large portion of the ground in controversy; and

"3d. That under the Statute of Limitations they have acquired title to the whole of this piece of land.

"These different positions by the learned counsel raise three principal questions—two of law and one of fact. The former are for the decision of the court—the latter for the jury.

"1st. The first question of law is, does the plaintiffs' title extend to the water's edge, or low-water mark, or is it limited to the mark called for on the top of the bluff bank where the distances run out ?

"2. If the lines are to be extended to the water's edge, are they to be so extended by their last courses or by right angles from low-water mark to the corners on the top of the bank ?

"Let us now examine the first question, viz.: Whether or not the plaintiffs' title carries him to the water's edge?

"The patent under which both parties claim, dated April 20th 1785, calls for 640 acres of land, situate on Saw Mill run, on the south side of the Ohio river, in the county of Washington, bounded as follows: '*Beginning at a corner hickory of Pittsburg Manor, standing on the bank of said Ohio river; thence by said Manor line*' a certain distance, and thence by various courses and distances '*to a corner ironwood tree, standing on the bank of said Ohio river;* thence up the same 233 *perches to the first-mentioned hickory and place of beginning.*' When partition of this tract of land was made in the Orphans' Court, among the heirs of Daniel Elliott, deceased, that portion adjoining the Manor line and embracing the disputed land, as now claimed by the plaintiffs, was awarded to West Elliott, one of his sons. West Elliott, by his deed heretofore referred to, conveyed 15 acres and 175 perches of this land to William Price, described as lying on the south side of the Ohio river, and running by land of said West Elliott, by various courses and distances, "*to a stake* on the bank of the *aforesaid river*, and thence up the same south 62° east, 4 perches to the place of beginning.' Price afterwards conveyed the same land to James O'Hara. West Elliott, by his deed heretofore referred to, conveyed 98 acres, part of the aforesaid tract of land taken at the appraisement, and containing, as it is said, the 15 acres last described: this tract of land is bounded and described as follows, viz.: Beginning at a post on the bank of the Ohio river and running thence by the 'Manor line' 210 perches, and thence by sundry courses and distances '*to a post on the bank of the Ohio river, and thence up the run to the place of beginning.*'

"Such are the boundaries described in the plaintiffs' chain of title, and it only remains to inquire whether the law carries it to the river's edge, or whether it must be limited to the hickory and post called for in the deeds?

"It may be worthy of observation just here, that, as both parties claim under the patent to Daniel Elliott, and as the boundaries therein described are in substance the same as those in all the deeds from West Elliott down, if the patent did not go to the river, the title to the whole river front must still be in the Commonwealth and liable to be patented any day by any one who might choose to apply for the same. A title or claim of this kind I apprehend would be as stoutly resisted by the present defendant as by the plaintiffs. The principle has been too long and too well settled in this state, by numerous decisions, to admit of doubt or question, that whenever natural boundaries are called for in a survey, more especially navigable rivers, they control the distances and artificial marks on the ground, and this rule has been adhered to with such tenacity, that nothing but the clearest and most satis-

[Wood v. Appal.]
factory intimation of the parties to the contrary will prevent its operation.  This rule of law is based not only on the general practice, experience and convenience of men, but on the soundest principles of reason.  In the early history of this country one of the strong inducements to purchase lands adjoining our rivers, or large streams of water, was the facility they afforded of taking their produce, lumber, minerals, &c., to market, as well as to enjoy water-power for their mills.  Prior to the construction of turnpikes, railroads or canals, the pack horse and the wagon roads, the latter a great portion of the year almost impassable—were the only other modes of conveyance the early settlers had—and hence the importance and convenience of having their farms extend to the river, thus affording free and unobstructed access to, and use of these great natural highways.  Another reason for the rule was that any artificial marks on the banks of these rivers were liable to be swept away or entirely obliterated by the frequent floods to which they were subject.  And still an additional reason might be stated, that by these floods, the banks on which these marks were made were liable to be and frequently were actually washed away, thus leaving no trace of the lines on the ground.  In many instances also, extensive deposits of earth washed from other places were made, extending out into the river for many feet or rods, which under any other rule of law would lead to great inconvenience, hardship and litigation.  But under the rule above stated, he who owns the land adjoining, goes to the low-water line, wherever that may be, subject to the use by the public of navigating the river between low and high water marks, and the right of the public to construct wharves or public landings thereon, whether he lose or gain by the action of the water, in washing away a portion of his ground or adding thereto by forming 'flats,' as those deposits are called.  Without extending our remarks further on this point [I am clearly of opinion that the boundaries called for in the plaintiffs' deeds carry the title to low-water mark, subject only to the right of the public to use the space between high and low water lines for the purpose of navigation.]  Only a very few of the numerous cases in this and other states will be referred to in support of this ruling.  *  *  *  These authorities, if there were no others, are abundantly sufficient to warrant us in ruling that the plaintiffs' title here extends to low-water mark, and therefore we instruct you as a matter of law, that so far as the question is concerned, the plaintiff is entitled to your verdict for all the land in dispute embraced by these lines, so extended to the water's edge or low-water mark.

2d.  " The next question to be determined is, how are the plaintiffs' lines to be extended; by the last course, when they reach the top of the bank, or at right angles with the low-water line to the point where the lines stopped on the bank, so as to give the

[Wood *v.* Appal.]

plaintiff the same front at low-water mark that he has on the bank ?

" The manor line extended to the river, would be nearly at right angles with lines of low water at that point, so that the question here arises chiefly on the extension of the western line, which, if produced on the same course as it was at the 'post' on the bank, would intersect the low-water line only a few feet from the manor line—in other words, it would leave to the plaintiff only a few feet on his water line; whereas, he has some 8 or 9 perches on his line between the post and hickory on the bank; this would cut him off almost entirely from any river front at all. A rule of this kind would render nugatory nearly all the decisions relative to surveys bounding on our navigable rivers; because it is very rare indeed, that the lines, on both sides of the survey, approach the river at right angles to the edge of the water; a slight change, therefore, in the course of either line, might cause it to intersect the other before it reached low-water mark; and a slight change in the course of the other line in an opposite direction, might give the whole river front of two tracts, to one owning the intermediate one. This course of proceeding would work great injustice to riparian owners, and produce endless strife and litigation. [The true legal as well as equitable rule, then, undoubtedly is to give each riparian owner the same front at low-water mark that he has on the shore or bank at the termination of his lines.

, " This is done by starting at low water line and running at right angles therewith to the last corner on the bank by the approaching lines, or, which is the same thing, to its intersection therewith. By this simple rule, all difficulty is avoided, and every owner of land along the shores of our rivers, has his equal share or proportion of the beach, or landing, and water privileges, down to low-water mark.] I am not aware that this question, in its present aspect, has ever been brought before our own Supreme Court, but it has been expressly ruled in some of the other states.

" In Knight *v.* Wilder, 2 Cushing 199 (Mass.), it was held that in running out the side lines of a riparian proprietor, on a river not navigable, they are to be extended from their respective termini on the shore at right angles with the course of the river, to the centre of the stream: unless otherwise established by the terms of the grant or conveyance under which he claims.

In several of the New England States, the rule of the common law of England has been adopted, giving to the riparian owner the right of soil *usque ad filum aquæ*. But the rule is different in Pennsylvania: here, the riparian owner goes only to low-water mark, and that right is subject to the right of the public for purposes of navigation between high and low water mark.

" These authorities, with others that might be cited, show clearly that the rule we have suggested is the true one, and that if the

[Wood v. Appal.]

plaintiff's deeds, thus construed, embrace the land in dispute, then so far as this question is concerned, your verdict should be for him." * * *

The remainder of the charge related to the Statute of Limitations.

The verdict was for the plaintiff.

The defendants removed the case to the Supreme Court and assigned for error the answers to the points and the portions of the charge included in brackets.

*J. I. Kuhn* and *R. Woods*, for plaintiffs in error.—If there were nothing but the description in the deed it might carry the title to the low-water line, but there were other things, *e. g.* the proviso relating to the ferry-house, &c., which indicated that the low-water line was not intended. There are cases where lines run near or along the river in which the line and not the river are taken to be the boundary: Wharton *v.* Garvin, 10 Casey 340; Kelly *v.* Graham, 9 Watts 116; Brolaskey *v.* McClain, 11 P. F. Smith 146. The court was wrong in ruling that the lines should run from the marks in the bank at right angles with the low-water line. When natural boundaries are called for the lines will stop when the boundary is reached and will be extended to reach it: Cox *v.* Couch, 8 Barr 147; Wharton *v.* Garvin, Kelly *v.* Graham, Brolaskey *v.* McClain, *supra.* The rule of the court would be proper only when the course of the stream is straight and the line on the bank parallel with it. If the shore curved outward there would be gores; if inward the lines would overlap. The constant change of the shores would prevent the preservation to each owner of the same river front. The simplest rule is to preserve the direction of the side lines; each owner to take his chance of gain or loss. The conveyance of West Elliott manifests that he intended to retain for himself a ferry and landing. By the application of Judge Hampton's rule the ferry of the defendants and their predecessors would be destroyed or transferred to the plaintiff. If the rectangular rule is to be established it should be with reference to the actual low-water line as it existed when the deed was made, not the artificial line established by commissioners under the Act of 1858. In Pennsylvania the limit of a riparian owner's title is to the low-water line, the marks on the bank are used to fix the *direction* by which the line shall reach the low-water mark. Such has been the understanding of the people and the decisions of the courts of this state.

The lease of the plaintiff which is very precise in its description would exclude a triangle which is included in the plaintiff's abstract of title, all of which is recovered by the verdict. The precise description controls the general description, " all that piece of

[Wood *v.* Appal.]

ground belonging" to her, &c., and the tenant cannot recover outside of the bounds precisely limited. The precise description is an admission that her title extended no further, and then in point of fact she did lease all the ground then belonging to her.

*M. W. Acheson* and *R. McKnight*, for defendant in error.—Where a stream is used in a grant as a boundary or monument, the boundary is the centre of it, modified in Pennsylvania as to navigable rivers, to low-water mark: 3 Kent's Com. 427–432; Naglee *v.* Ingersoll, 7 Barr 201; Sergts. Land Law 193; Barclay *v.* Ingham, 12 Casey 194; Cooper *v.* Smith, 9 S. & R. 26; Commonwealth *v.* Fisher, 1 Penna. R. 462; Bear *v.* Russell, 2 Yeates 130; Carson *v.* Blazer, 2 Binney 475; Shrunk *v.* Sch. Nav. Co., 14 S. & R. 71; Freytag *v.* Powell, 1 Whart. 536; Angell on Water Courses, sect. 15, 25–36; Luce *v.* Carley, 24 Wendell 451, 2 Smith's Lead. C. 235, note 244; Blanchard *v.* Porter, 11 Ohio 138; Lamb *v.* Ricketts, Id. 311; Jones *v.* Janney, 8. W. & S. 443. The reservation as to the ferry-house would have been unnecessary if Elliott had in fact retained the title for the whole front. His object was to keep away a ferry-house, &c., to compete with one he might erect on his own land. The running of the lines from the marks on the bank to the river is not to be made as running the lines of a farm where the points are fixed, for riparian rights pass as incidents to the land on the bank. Riparian owners have the right of property opposite their land: 3 Kent's Com. 411: Ex parte Jennings, 20 Johns. 90. In order to get the extent of the riparian owner's line in the bed of the stream, lines are to be drawn from the points on the bank where the shore-lines terminate at right angles with bank to the thread of the river: Carter *v.* Murcot, 4 Burrows 2162. The riparian owner has a portion of the bed of the stream in proportion to his line on the margin, lying in front of his upland: Angell on Water Courses, sect. 11; Price on Lim. 63; Ball *v.* Slack, 2 Whart. 508; Jones *v.* Janney, Naglee *v.* Ingersoll, *supra;* Knight *v.* Wilder, 2 Cush. 199; Rust *v.* Boston Mill Co., 6 Pick. 158; Deerfield *v.* Arms, 17 Id. 41; Sparhawk *v.* Bullard, 1 Metc. 106; Flanagan *v.* Philadelphia, 6 Wright 219; Barton *v.* Bouvier, 1 Phila. R. 523. Alluvion belongs to the owner of the land which it adjoins: Walker's Am. Law 319; 2 Washburn on Real Prop. 443–447 and notes; Morgan *v.* Scott, 2 Casey 51; Commonwealth *v.* Shaw, 14 S. & R. 12; Lamb *v.* Ricketts, *supra.* Land formed by alluvion is to be divided amongst the several riparian proprietors by measuring the ancient line and dividing the new line in the proportions each owned of the old line: Angell on Water-Courses, sect. 55, 56 and notes, Deerfield *v.* Arms, *supra.* This law of alluvion will, if applied to this case, establish Mrs. Denny's title to the whole of the front claimed by her, because accretions

[Wood v. Appal.]

might gradually be enlarged both by natural and artificial causes until she would be shut out from the entire river front.

The opinion of the court was delivered, January 3d 1870, by

AGNEW, J.—Ever since the case of Carson v. Blaser, 2 Binney 475, decided in 1810, it has been held in many cases that a survey, returned as bounded by a large navigable river, vests in the owner the right of soil to ordinary low-water mark of the stream, subject to the public right of passage for navigation, fishing, &c., in the stream, between ordinary high and ordinary low water mark. Variety in the language of the return matters little, so that the intention to make the stream a boundary appears sufficiently in the description and diagram. In determining this both are taken together. The variety of expression in the decided cases is very great. In Carson v. Blaser, *supra*, the description in the patent (taken, of course, from the return of survey) was " beginning at a birch *by the river ;*" thence running outward and returning " to a red-oak *by the same river*, and thence *by the same*, the several courses thereof, to the beginning."

In Hart v. Hill, 1 Wharton 124, the counsel of defendant contended (p. 131) that the deeds of the plaintiff were bounded by " stakes and stones on the banks of the river," but Kennedy, J., interposed, saying : " This is universal in the country, surveyors never go into the water for the purpose." And Huston, J., said : " It has often been decided that the owners of land hold to low-water mark, notwithstanding such boundaries." They were both eminent as land lawyers.

Klingensmith v. Ground, 5 Watts 458, decided in 1836, was the case of a private deed describing the land as beginning at a sugar tree on the bank of the river and running up the same north 59 degrees south 59 perches to a stump *near* the creek, thence *up the creek* north 14½ perches to a stone. The court below thought that the word " near" indicated an intention not to make the creek a boundary, but this court held the creek to be the boundary.

In Ball v. Stark, decided in 1837, 2 Wharton 508, the description in the proprietary's grant began at the " mouth of Gunner's creek," thence running up the several courses of the Delaware and returning " to a corner white-oak standing *near* unto the above said Gunner's creek, from thence following *down the several watercourses thereof* to the place of beginning." It was held this description led into the mouth of Gunner's creek at its junction with the Delaware at low water, notwithstanding at high tide running a mile up Gunner's creek the plaintiff would have been cut off from the creek at its mouth.

The patent in Coovert v. O'Connor, 8 Watts 470, described the land next to Mahoning creek, a branch of the Big Beaver, thus— " to a birch *on* Big Beaver, thence *down the said creek* the follow-

[Wood *v.* Appal.]

ing courses : south 76 degrees east 75 perches, north 83 degrees east 40 perches, south 62 degrees east 125 perches, north 55 degrees east 23 perches, to a post." In this case the birch tree stood on the bank of the stream, and the survey ran from it by courses and distances actually run along the bank, yet it was held that the description " down the said creek" carried the title *ad filum aquæ.*

The principle which thus abandons the courses and distances for the stream itself is thus stated by Gibson, C. J., in Cox *v.* Couch, 8 Barr 154 :—" By reason of imperfection of instruments as well as inequalities of surface, and carelessness of assistants, extreme accuracy is not to be attained by the compass and chain ; while, on the other hand, calls for natural objects, or what is much the same, known and established lines of contiguous tracts, admit of perfect certainty. Where a vendor, therefore, conveys, by established land-marks, the subject of the grant will neither overrun nor fall short of them. They form the true boundary, and the courses and distances serve but to point to the place."

In the analogous case of Paul *v.* Carver, 2 Casey 223, the boundary was described as " thence southeasterly along the northerly *side* of the said Tidmarsh street," and it was held to carry the title to the centre of the street. The same was decided in Cox *v.* Freedly, 9 Casey 124, upon a deed calling for stakes on Egypt and Race streets, " *thence along the north-east side of Egypt,*" and " along the south-east side of Race," although in the same deed another boundary on an alley called for a stake in the *middle* of the alley, " thence along the *middle of said alley.*" Woodward, J., there remarks that in surveys bounded on streams and streets the marks must necessarily stand on the margin.

There are cases supposed to be exceptions to the rule I have stated, but they are not so. The principal of these are Kelly *v.* Graham, 9 Watts 116, and Wharton *v.* Garvin, 10 Casey 340. The report of the former omits the return of survey, but Justice Kennedy says in his opinion :—" The survey, as returned here by the deputy surveyor, as also all the other evidence on the subject, *shows most unequivocally that the river is not made a boundary in it,* and indeed that it could not have been so intended. The draft of the survey returned is made out according to the courses and distances actually run and marked upon the ground, and not made to call for the river on any side oᴙ point whatever. *At some distance from the survey,* however, the Allegheny river is laid down upon a straight line without any regard to its meanders, as if it were intended by the artist merely to show that the land included within the survey lay near to the river." The case is therefore not an exception to the rule, but is distinguished from it by the fact that the river was not made or intended to be, a boundary. The real difficulty in that case

was that the patent by mistake called for the river, but the court corrected the mistake by a reference to the survey itself, which * negatived the call.

Wharton v. Garvin stands in exactly the same attitude. The north and south lines found upon the ground did not reach the river by 40 perches on the north and 19 perches on the south. The diagram exhibited no protraction to the river, and the closing line was represented as a straight line of 238 perches long, leaving a large vacancy between it and the river. The return did not call for the river as a boundary, but it was represented at some distance off with the words written within representation, "up Allegheny." The opinion was written by Justice Thompson, the present Chief Justice, who was careful to distinguish the case upon its facts. He remarked that generally a survey is to be carried to its calls unless there are actual lines on the ground excluding them; that a call to stand as a boundary must be indicated to be such with sufficient certainty to show that it was so intended. The representation of an object at a distance from a closing line without any words indicative of an intent to make it a boundary would hardly be sufficient to constitute it such. The line plotted at a distance would have little weight, he remarked, if the river had been made the call, and as it is not so made in terms and appears to be excluded by the draft, it is a circumstance of controlling influence, as held in Kelly v. Graham, *supra*. Thus it was the intent of the surveyor (appearing clearly in the return of survey) to bound the survey on the 238 perch line, and not on the river, which controlled the decision. Instead of impugning the general doctrine the case supports it, and the judge remarked: " We are *predisposed* to presume the existence of an intent to bound surveys on navigable waters by the stream, not only on account of the supposed advantage arising from such location, but because it is in accordance with practice."

Some inference has probably been drawn from that case, as an exception, from the fact that the closing line (238 perches) did not appear to be marked on the ground. But this had no real influence on the decision, for the river being out of the question as a boundary not called for at all, the closing line must necessarily be run from the corners standing 40 and 19 perches from the river, on the principle stated by Justice Thompson in Hunt v. McFarland, 2 Wright 69.

The governing principle of the rule before stated is found also in Walker v. Smith, 2 Barr 43, and Thomas v. Mowrer, 3 Harris 139, qualifying the generality of the opinion in Martz v. Hartley, 4 Watts 262, and holding that where the lines of adjacent surveys are both found run and actually marked on the ground, they overcome the call for each other or even calls for a natural or other boundary. An old case strongly illustrating the principle is Mageehan

[Wood *v.* Appal.]

*v.* Adams, 2 Binney 109, where the survey and patent called for
a black-oak on the state line, thence *by the same*, 130 perches to a
post; yet evidence was received to show that the black-oak and
line actually stood 30 perches from the line of the state.

The result of the cases is, that when a return of survey calls
for a stream as its boundary, or to run by, along, up or down it;
the title will run to the stream, and the marking of trees on the
bank or margin of the stream to identify the lines run to the river,
as well as the return, of courses and distances measured along the
margin, necessarily to ascertain the quantity of land in the sur-
vey, will not restrain the title to the bank or margin only.    As
was said in Klingensmith *v.* Ground, *supra*, a corner tree is not
always to be had where it is wanted, and then the next most con-
venient must be taken; or as in Ball *v.* Stark, *supra*, a surveyor
cannot run a curved line with compass; but if a creek is returned
as the line there can be no mistake as to it, and the courses and
distances along it are to be disregarded.    See also Cox *v.* Freedley,
9 Casey 130.    It is held also that public and private surveys are
alike in this respect, and a private deed is judged of by the same
rule: Cox *v.* Couch, 8 Barr 154; Caldwell *v.* Holler, 4 Wright
168.    In navigable streams the title runs to ordinary low-water
line, and in unnavigable to the middle of the stream.    But if the
stream is not made the boundary, or if a line is actually run
and marked for the survey apart from the stream, the rule changes
to suit the facts of the case.

Then to come to the case before us: Daniel Elliott's patent de-
scribed the land as "beginning at a corner hickory of Pittsburg
Manor *standing on the bank of the Ohio* river; thence by said
Manor line outward, then returning "to a corner ironwood tree
*standing on the bank of said Ohio river, thence up the same* 233
perches to the first-mentioned hickory and place of beginning."

West Elliott's deeds to Wm. Price and to James O'Hara, are
in language precisely similar as to the river, excepting that a
less quantity of land is embraced, with less river front.    There
can be no doubt that both the patent and the deeds extend
the title to ordinary low-water mark of the river.    The proviso
in the deeds to Price and O'Hara, we think, does not control
the description in the deeds.

Another question more difficult,—and new in Pennsylvania, so
far as we can discover,—is as to what river frontage these deeds con-
vey.    The upper or Manor line runs to the river at right angles
nearly, but the lower or Crawford line runs to the river very
obliquely, meeting the Manor line by compass course on the shore,
at about low-water mark.

The court below held that the lines running to the bank or mar-
gin of the river, instead of continuing in the same course by the
compass, must run from their terminating points on the bank

[Wood v. Appal.]

directly to the stream, at right angles to it; or in other words, each line on leaving the bank must run over the shore by the most direct and shortest route.  The plaintiff in error argues that the lines should run by the same compass course to the stream, whether they cross each other before reaching the stream or diverge widely apart.

We have no precedents in this state to guide us, while foreign cases are not governed by the same principles which prevail here. We must decide this case upon what we deem to be common understanding and usage, and the reason and convenience of the thing. As we have already seen, the practice of surveyors, in coming to a stream, is to stop upon its bank or margin, at the nearest convenient approach to the stream, and there to mark the corner indicating where the line strikes the stream.  This is necessary to preserve the monuments of survey, as well as for convenience in making it.  When the corner is set upon the high bank the stream may be one or many perches off, according to the character of the stream or its stage of water.  In March or April a surveyor would probably find this river bank full, while in August or September he would find the water many perches away from the bank.  The Allegheny and Ohio rivers at a low stage in many places fill less than one-half of their breadth between the banks.  It is obvious, therefore, when the surveyor, running in toward the river, stops on its bank and makes his corner, he means, in the absence of other evidence found in his return, to indicate his nearest convenient approach to the stream, and thus to mark where his line strikes the stream, and the river front it gives to the owner of the survey.  If he intended to continue his line by the compass course to the water's edge, we would expect to find something in his return to indicate this intent.  The very fact that he runs a line along the stream from the end of one line to the end of the other line, where it reaches the bank, is the evidence that he does not intend to continue his line to an apex on the shore, otherwise he would have returned no such intermediate line.  Thus it is hardly supposable that he intended the oblique line to run to an apex on the shore with the Manor line, and to cut off the owner of the survey from all the river front in low water, and dispensing also with the intermediate line.

The serpentine course of the stream, or its relative distances from the bank at different points, can make no serious difference as to the line of approach to the water's edge.  Starting from the bank, a direct course to the stream, or at right angles to the stream, must always afford the shortest and most certain boundary of river frontage.  Of course the rule as now laid down applies only to a case where no other intention is disclosed by the return of survey, or the deed.

In relation to the lease to Appal, it is sufficient to say that we

13 P. F. SMITH—15

think that the recital of the land intended to be leased, and the provision that no reduction in the rent should be made for interference by parties in possession of the Crawford or Wood property, show an intention to include all the land to the river, and the course of the oblique line over the shore is evidently an error of the scrivener, which is corrected by the other parts of the lease.

Judgment affirmed.