# J. E. Smucker, Executor of Frank Hefright, deceased, and Ann Esther Cunningham, Appellants, *v.* The Pennsylvania Railroad Company.

*Riparian rights—Effect of survey—Land bounded by stream.*

A survey returned as bounded by a navigable river vests in the owner the right of soil to ordinary low watermark of the stream subject to the public right of passage, etc., between ordinary high and low watermark and where there is nothing more in the case, the successors in the title hold coextensively.

*Eminent domain—Evidence—Ex parte drafts made by commonwealth.*

In order to fix the location of land appropriated by the state to public uses, a draft attached to the report of the inquisition appointed to assess the damages, together with all the explanatory memoranda attached thereto is admissible in evidence to show the location of the canal because it forms part of the record: Pennsylvania Canal Co. v. Dunkel, 101 Pa. 103; but an ex parte draft, offered to show the location of a canal which was not used in and which did not pertain to, either an amicable or adverse proceeding between the state and the landowner, made after the canal was finished, without knowledge or consent of the owners and long subsequent to the settlement had with a number of the owners of distinct parts of the locus in quo, is inadmissible.

*Actions—Trespass for trying title.*

The right exists to bring trespass for an original tort for the purpose of

trying title, and the judgment in such an action has the same effect on the question of title as a judgment in ejectment.

*Trespass for trying title—What constitutes possession.*

A mere discontinuance of actual occupancy of town lots, without an intention to abandon, does not put the true owner out of legal possession. To hold possession of a town lot once occupied, it is not necessarily required that the owner should build on it or even fence it. When there is no actual possession in another, the owner is to be deemed in actual possession, and trespass will lie against a wrongdoer, it is the close of him who has the right.

*Evidence—Credibility of witness—Question for jury.*

It does not follow because a witness is not directly contradicted by another witness, that his testimony is undisputed. His manner on the stand, his lapses of memory, the improbability of his story, its self-contradiction, the evidence afforded by circumstances, all these or some of them may rightly lead the jury to reject his testimony. The credibility of a witness, whether it is directly or indirectly involved, is for the jury.

*Question for jury—Eminent domain.*

The question whether or not a particular strip of land was or was not taken by the state for the location of a canal is for the jury, there being more than a scintilla of evidence that the state left some land above low watermark, unappropriated, the land between high and low watermarks being the land in question.

*Charge of court—Right and propriety of comment on evidence.*

It is always the right and often the duty of the court freely to discuss the evidence. Comments kept within bounds are entirely legitimate they aid the jury, frequently prevent unjust and absurd verdicts, and thus help to preserve the respect of the people for the jury system.

Argued March 15, 1897. Appeal, No. 26, March T., 1897, by plaintiffs, from judgment of C. P. Huntingdon Co., Sept. T., 1891, No. 43, on verdict for defendant. Before Rice, P. J., Willard, Wickham, Beaver, Reeder and Smith, JJ. Reversed.

Trespass for occupation of plaintiffs' lands. Before Bell, P. J., of the 24th judicial district, specially presiding.

This action was brought to recover damages for injuries done by defendant to the plaintiffs by casting a large quantity of stone and dirt and by laying railroad tracks upon a strip of ground lying between the abandoned Pennsylvania canal and the Juniata river, and forming the southern parts of lots numbered from 109 to 116, inclusive, in the recorded plan of the

borough of Huntingdon. Damages were laid in the sum of $1,000.

Other facts sufficiently appear in the opinion of the court.

Verdict and judgment for defendant. Plaintiffs appealed.

*Errors assigned* among others were (3) The answer to plaintiffs' third point, which point and answer are as follows.: " 3. Trespass will lie for injury to the qualified title between. high and low watermark. *Answer :* As applicable to the facts in the case this point is denied." (11) In giving binding instructions for defendant.

*W. B. Simpson* and *H. H. Waite,* with them *J. R. Simpson,* for appellants.

*John D. Dorris,* with him *William Dorris,* for appellee.

OPINION BY WICKHAM, J., February 19, 1898:

On November 21, 1787, the commonwealth of Pennsylvania granted to William Smith, his heirs and assigns, a tract of land called The Standing Stone, and bounded and described as follows: " Situate on the northeast side of Frankstown branch of Juniata, in Huntingdon county, beginning at a hickory on the bank of said branch, thence by a vacant hill north 63° east 118 perches to a post; thence by land of Ashur Clayton and vacant Piney hill south 20° east 262 perches to a hickory; thence by Piney hill south 42° east 152 perches to a corner white oak of William Smith's land; thence by the same south 27° east 94 perches to a white oak; thence by a vacant hill south 17° east 109 perches to a pine; and south 44° west 12 perches to a hickory on the bank of said branch; thence up the same 696 perches to the place of beginning; containing 428 acres and ⅝ and allowance of 6% for roads, etc., with the appurtenances. [Which said tract was surveyed in pursuance of a warrant granted to the said George Croghan, dated December 10, 1764, who by deed duly recorded at Carlisle, in the county of Cumberland, conveyed the same to the said William Smith in fee.]"

On November 14, 1795, Smith plotted and laid out the town of Huntingdon, afterwards incorporated as a borough, on the

tract of land above described. The external boundaries of the town, as set forth in words and figures on the plan thereof, are as follows: " Beginning at a large stone corner placed on the banks of the river Juniata down by entrance of a fording place and at the distance of 200 feet on a creek south 66° east from the east side of St. Clair street; then running from said stone or place of beginning north 24° east 109 perches and $\frac{7}{10}$ of a perch to a stone; thence north 66° west 157 perches to a stone; thence south 24° west, including Charles street, 110 perches or thereabouts to the river Juniata, thence down the same on the northerly bank or side to the place of beginning."

The subject-matter of the present controversy is a strip of land extending along the Juniata river between Fourth and Fifth streets, in the said borough, the same consisting of the southern ends of lots Nos. 109, 110, 111, 112, 113, 114, 115 and 116 in the aforesaid plan. This strip is only a few yards wide, lies mostly, perhaps altogether, between high and low water-mark of the stream, and was unimproved, uninclosed, and un-cultivated when the defendant took possession thereof.

Between the years 1828 and 1830 the Pennsylvania canal was constructed by the state over and through the lots, the numbers whereof have just been given, and compensation was duly made to the owners for the taking and injury. The Penn-sylvania Railroad Company in 1857 succeeded the state in the ownership of the canal property. In 1867 it conveyed all its rights therein to the Pennsylvania Canal Company. The canal company reconveyed to the railroad company in 1889.

In 1891, the railroad company, claiming that the state in constructing the canal had appropriated the disputed land, and that, therefore, it was part of the canal property, decided to use it in connection with its adjoining lands for railroad pur-poses. To this end, the company took possession of the strip, made fills, built embankments, and laid tracks thereon. At the time the plaintiff's action was brought, on August 8, 1891, the land was occupied by the defendant, and improvements were still going on.

Naturally the first question presenting itself for solution is, whether Smith under his patent from the commonwealth took merely to the bank of the river, or to ordinary low watermark. The stream, it is proper to say, was made navigable by act of

March, 1771. In view of the decision in Wood v. Appal, 63 Pa. 210, and the many earlier Pennsylvania cases therein cited and discussed by MR. JUSTICE AGNEW, we cannot hesitate in holding, as was there held, that the grant extended to ordinary low watermark, subject only to the rights of the public as to navigation, fishing, etc. The description in Wood v. Appal, so far as we are concerned with it, is so similar to the one under consideration here that we reproduce it : " Beginning at corner hickory, at Pittsburg Manor, standing on the bank of the Ohio river; thence, by said Manor, south 14° west . . . . north 37° degrees east 60 perches to a corner iron wood tree standing on the bank of said Ohio river; thence up the river 233 perches to the first mentioned hickory, the place of beginning." See also Palmer v. Farrell, 129 Pa. 162.

The next question for consideration is, whether Smith intended that the southern boundaries of the lots above mentioned, or of any of them, should run to the ordinary low watermark line. Applying the law as settled by the above decisions to the description and plot of the town, we are satisfied that such was his intention, and that each and all the lots extended to low watermark. The description carries the town lines on the south to that point, and the plot shows no street or strip of land reserved for the founder, or the public, along the stream.

We are therefore constrained to hold, as a matter of law, on the uncontradicted evidence before us, that the grantees of these lots took title to ordinary low watermark, and that were there nothing more in the case, their successors in title, whoever they may be, would hold coextensively. It devolved on the plaintiffs to show title to the premises in dispute, or some part thereof, in order to recover in whole or in part. This they sought to do by offering conveyances for the ends of the lots lying south of what they allege to be the canal appropriation. As to most of the strip, their paper title seemed, prima facie, good, unless the state in making the canal appropriated the land out to low watermark. The court below was of the opinion that the state left no part of the strip, south of the canal, unappropriated; that the lots as laid out by Smith extended only to the bank of the river, and further held that, even if the plaintiffs had shown an undoubted title, they could not sustain an action of trespass, because they were not in actual occupancy

when the company entered on the land.    For these reasons, a verdict was directed for the defendant.

As to the second ground for so ruling, we have already sufficiently expressed an opinion.    The first reason was for the jury to pass on, there being more than a scintilla of evidence that the state left some land, above low watermark, unappropriated, and that as late as 1871, the ends of lot No. 110 or 111, or both, were occupied by a building held by persons claiming under and through the parties, who owned at the time the canal was constructed.    There was also other evidence proper to submit to the jury on this point.    In adopting the view he did regarding this matter, the learned trial judge was no doubt strongly influenced by certain words and figures, appearing on a draft of that part of the canal lying within the limits of the borough, which draft was and is on file in the proper office in Harrisburg. It appears, however, from the defendant's own statement, made when the draft was admitted in evidence against the plaintiff's objection, that it was not drawn until December 29, 1832, (see page 33 of Appendix to appellant's paper book,) and both sides agree, as will be seen by reference to their respective histories of the case, that the appropriation, by the state, must have been made between 1828 and 1830.    It is also shown, by releases offered in evidence by the defendant, that as to several of the lots at least, the damage for the taking had been agreed on, and paid to the owners as early as 1829 and 1830.

In Pennsylvania Canal Co. v. Dunkel, 101 Pa. 103, decided in 1882, it was held that a draft attached to the report of the viewers appointed to assess damages, together with all the explanatory memoranda thereon, was admissible to show the location of the canal, because it was part of the record of the proceedings, and as Mr. Justice Trunkey says: "It was made after the beginning of the canal and before its completion.    It must have been known to the parties interested.    It is consistent with the place where the canal was constructed."    In the present case, so far as we can see, the draft was ex parte, was not used in, and did not pertain to, either an amicable or adverse proceeding between the State and the land owners, was made after the canal was finished, without the knowledge or consent of the owners, and long subsequent to the settlement had with a number of the owners of distinct parts of the locus in quo.

If it be contended that the draft was admissible, as part of an official book or register, its competency, unless offered in support of an actual possession, and to explain the extent of the possession and claim, which was not and could not be the purpose of the offer here, is denied by the just rule laid down in 1 Greenleaf on Evidence (13th ed.), section 485, as follows : " It is deemed essential to the official character of these books that the entries in them be made promptly, or at least without such long delay as to impair their credibility." It will hardly ·be contended that even the state, notwithstanding its great powers, can make title for itself, at the expense of the rights of its citizens, by maps or drafts prepared in secret, years after the event to which they relate, the entering of which in the official records persons to be affected knew nothing of, and, if they did, might be powerless to prevent.

How far these remarks regarding the draft will be applicable at the next trial will depend on the evidence then adduced. If it shall be made to appear that the taking, in·the case of any of the lots, was in accordance with the draft, or that it served as a basis for fixing the compensation, to that extent, in the absence of countervailing evidence, it should be held conclusive against the plaintiff's right. By the draft, we mean not merely the lines drawn thereon, but the whole instrument, including the explanatory words and figures. Standing alone and taken as a whole, it sufficiently shows an intended appropriation by the state of all of the lots lying south of the bed of the canal. This is clearly indicated by the figures in the column showing how much of each lot was left to the original owner, and by the entire absence of lot lines south of the canal bed.

We are compelled to differ in part with the view of the learned trial judge as to the right of the plaintiffs to maintain trespass. They may, if they show good title, recover for the original trespass, that is, the disseisin, but not for anything done later. To obtain a status to recover for injuries caused to the land, or for mesne profits, while the defendants have been and are in possession, the plaintiffs must first regain possession by an action of ejectment: 2 Greenleaf on Evidence (13th ed.), section 619; 2 Waterman on Tres. 371; Bigelow v. Jones, 27 Mass. 161; Graham v. Houston, 4 Dev. (N. C.) 232;

Rowland v. Rowland, 8 Ohio, 40. The right to bring trespass in this state for the original tort, for the purpose of trying title, is impliedly recognized in our Act of April, 6, 1869, P. L. 16, which provides that the judgment in such an action shall have the same effect on the question of title as a judgment in ejectment. It appears, from the pleadings and evidence, that the acts complained of by the plaintiffs were done pursuant to a plan to hold the land permanently, and under claim of right, which claim in Pennsylvania when acted upon, as in this case, gives color of title: Green v. Kellum, 23 Pa. 254; Fisher v. Philadelphia, 75 Pa. 392. The defendant entered upon the premises, made extensive and necessarily expensive improvements, and at the time suit was brought was holding and using the ground in the manner in which a railroad company usually possesses and enjoys such property, that is, by means of its tracks and their substructure. As said before, there can be no recovery in trespass for anything done by the company while it retains such possession.

But it is seemingly urged, that actual physical occupation of the land, or at least inclosure by the plaintiffs, at the very time of the commission of the trespass, must be shown to sustain the suit. We do not so understand the law. The locus in quo consists of parts of town lots which had been occupied by the owners for a long period before the canal was constructed, and if the evidence offered for the plaintiffs were correct, were in the possession of their predecessors in title, claiming under and through such owners, long after the canal was made. A mere discontinuance of actual occupancy, under the circumstances, without an intention to abandon, would not put the true owner out of legal possession. To hold possession of a town lot once occupied, it is not necessarily required that the owner should build on, or even fence it. "When there is no actual possession in another, the owner of course is to be deemed in actual possession:" Clark v. Smith, 25 Pa. 137. "Where possession is vacant, trespass will lie against a wrongdoer, it is the close of him who has the right:" Mather v. Ministers et al., 3 S. & R. 508, 512, and cases there cited. Even if we are to regard the locus in quo as having lapsed into the condition of wild land, the rule laid down in the above decisions, and also in Porter v. McGinnis, 1 Pa. 413, Baker v.

King, 18 Pa. 138, Miller v. Zufall, 113 Pa. 317, and a number of other authorities, is equally applicable. We may add that the failure of the evidence to show any formal entry by the plaintiffs, under their title, is not material, since entry is unnecessary in Pennsylvania: Carlisle v. Stitler, 1 P. & W. 6.

In view of the above discussion of the salient points of the case, it is not necessary to pass on each assignment of error. One matter, however, not already considered, may be properly touched on. It does not follow, because a witness is not directly contradicted by another witness, that his testimony is undisputed. His manner on the stand, his lapses of memory, the improbability of his story, its self-contradiction, the evidence afforded by circumstances, all these things, or some of them, may rightly lead the jury to reject his testimony. The jurors should be left free to draw their own conclusions, unless the absolute verity of the witness's statements are either expressly, or by the clearest implication, admitted. The credibility of the witness, where it is directly or indirectly involved, is for the jury: Grambs v. Lynch, 4 Penny. 243.

But while this is true, it is always the right and often the duty of the court to freely discuss the evidence. Comments, kept within proper bounds, are entirely legitimate, they aid the jury, frequently prevent unjust or absurd verdicts, and thus help to preserve the respect of the people for the jury system.

Judgment reversed and venire facias de novo awarded.